**Jonathan YOUNG, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee.**

**No. 2012–SC–000491–MR.**

Supreme Court of Kentucky.

April 17, 2014.

V. Gene Lewter, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, Jeffrey Allan Cross, Assistant Attorney General, Office of Criminal Appeals, Attorney General's Office, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

Appellant, Jonathan Young, was convicted of murder by complicity, first-degree robbery by complicity, and second-degree arson by complicity. On appeal, he alleges three errors: (1) that he was entitled to a directed verdict of acquittal on the charge of murder; (2) that he was entitled to a directed verdict of acquittal on the charge of robbery; and (3) that the trial court committed palpable error by failing to require the jury to find any state of mind on the complicity counts. For the reasons set forth herein, we reverse Appellant's convictions and sentence.

## I. Background

During the early morning hours of August 26, 2010, fire and rescue workers responded to a report of a house fire at the home of Thomas Max Martin. The responders found the home totally engulfed in flames and discovered Martin dead inside the home. Although his body was badly burned, there were two suspicious round holes in his skull. An autopsy of Martin's body confirmed that his cause of death had been two gunshot wounds to the head, not the fire at his residence.

Police soon learned that on the evening of the fire, a neighbor had visited Martin at his home at approximately 10:00 p.m. on August 25, and that at the time he had visited, two other men had been with Martin. The neighbor stated that one of the men went by the name "Jess." This information led police to focus their investigation on Jesse Parke and his eventual co-indictee, the Appellant.

Appellant spoke with police numerous times during the murder investigation. During his first interview, he stated that he and Parke had gone to the victim's house on the day of the fire between 6:30 p.m. and 7:00 p.m., but claimed they had left "right at dark." He stated he had seen Martin's shotgun at the home but no other guns, which was contrary to several other witnesses' statements that Martin always kept a handgun in his pocket or on the table next to his recliner. He further stated that when he left Martin's home, Martin was alive and sitting in his recliner, and that he had gone outside first and Parke soon joined him.

During his second interview, police confronted Appellant with the neighbor's statement that Appellant and Parke had been at Martin's home much later than he originally stated. Although he initially remained adamant that he left Martin's around nightfall, he eventually admitted he could have left as late as 9:30 p.m. or 10:00 p.m. He stated that after he left Martin's home, he went to Parke's house for a time,

and then to his own home to go to bed. He claimed that Parke had called him before daylight and advised "some business" was going to be "taken care of" and then Parke had later told him "the deed was done." Appellant indicated that he understood this conversation to mean that a particular third-party had killed Martin and he denied having anything to do with the victim's death.

Police investigated Appellant's claim of third-party involvement in Martin's death, determined it was not credible, and interviewed him a third time. In this interview, he claimed that Parke had contacted him between 2:00 a.m. and 3:00 a.m. and told him not to be around Martin's home because "bad shit" was going to happen—namely, that a third-party was going to kill Martin. Parke then contacted him a second time and told him Martin's house was on fire. Appellant stated he drove to Martin's house to see that it was on fire and later met with Parke so they could keep their stories straight because they thought it looked suspicious that they had both been at Martin's house the night of the fire. Appellant continued to maintain that a third-party killed Martin and that neither he nor Parke had killed him. After a short break in this interview, Appellant changed his story again, claiming he left Martin's house first, Parke exited behind him, and that they drove by the house later at Parke's suggestion and saw that it was on fire.

A fourth interview was conducted at Appellant's request. During this interview, he stated that Parke shot Martin with Martin's own handgun because Martin had offered Parke money to have sex with Parke's girlfriend. According to Appellant, when the murder occurred Martin had been sitting in his recliner when Parke shot him in the head from behind, and that he had been sitting in a chair next to

Martin. Parke had then poured an accelerant throughout the house and set it on fire. He stated that Parke had taken the handgun with him when they left Martin's house at approximately 2:30 a.m., and that he and Parke had later returned to the home and Parke reignited the fire after he discovered it had not continued to burn. During this interview, Appellant tried to distance himself from the murder, claiming that Parke had signaled to him an intention to kill Martin, and that he had declined to participate. He also stated that in response to a text from Parke stating his intention to kill Martin, he responded indifferently.

During his final interview, Appellant initiated a recorded phone call to Jesse Parke to help police gather more information about the murder, diagrammed the location of Martin's wounds, and provided police with a four-page written statement detailing the night of the murder.

During this interview, Appellant also provided details about robbing Martin after he had been murdered. In his written statement, Appellant claimed that Parke had taken Xanax tablets from the victim's house, as well as the victim's wallet containing $280, and that the pair had split the proceeds later that night. He also acknowledged that prior to the night of the murder, he and Parke had discussed Martin owning a metal box containing thousands of dollars, but he denied going to the house to rob the victim.

Appellant was charged with murder, first-degree robbery, and second-degree arson. After a jury trial, Appellant was convicted of murder by complicity, first-degree robbery by complicity, and second-degree arson by complicity. He was sentenced to sixty-five years' imprisonment and now appeals his conviction and sentence as a matter of right. See Ky. Const. § 110(2)(b).

## II. Analysis

### A. Directed Verdict for Murder

█ Appellant argues the trial court erred by denying his motion for a directed verdict on the charge of murder because there was insufficient evidence that he had acted in complicity with Parke in the murder of Martin. The issue was preserved for appeal.

█ A trial court presented with a motion for a directed verdict "must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth" and "[i]f the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given." *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky.1991). On appellate review, a directed-verdict decision will be reversed only "if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt." *Id.*

Appellant was convicted of murder by complicity under KRS 502.020, which has been recognized as containing "two separate and distinct theories under which a person can be found guilty by complicity." *Smith v. Commonwealth*, 370 S.W.3d 871, 876 (Ky.2012). KRS 502.020(1) concerns "complicity to the act" and applies when the principal actor's *conduct* constitutes the criminal offense. *Id.* KRS 502.020(2), on the other hand, recognizes liability for "complicity to the result" and is appropriate where the *result* of the principal's conduct constitutes the criminal offense. *Id.* On appeal, Appellant argues there was insufficient evidence to convict him of murder by complicity under either KRS 502.020(1) or (2).

█ The "general rule" of accomplice liability is that it reaches only crimes that defendants intend or had a conscious objective to commit. George G. Seelig, *Ken-tucky Criminal Law* § 3–3(c)(1) at 111 (2d. ed.2008). This notion is embodied in KRS 502.020(1). KRS 502.020(2), however, expands upon the general rule and imposes accomplice liability on those persons who participate in conduct causing criminal results when such persons have the requisite state of mind with respect to those results. *Id.*

Homicide is a "result" crime and is thus within the bounds of KRS 502.020(2). *Id.* at 877; *see also Peacher v. Commonwealth*, 391 S.W.3d 821, 845 (Ky.2013) ("[H]omicide and assault crimes are 'result' crimes in which the jury must find the required result—death for a homicide and injury for an assault."); KRS 502.020 Kentucky Crime Commission/LRC Commentary (1974) ("The offenses most likely to be affected by [KRS 502.020(2) ] are homicide, with death of another as the prohibited result, and assault, with bodily injury of another as the prohibited result."). This Court, nonetheless, has held that accomplice liability for intentional homicide can be imposed under KRS 502.020(1) where there is evidence that a defendant "actively participated in the actions of the principal, or failed in a legal duty to prevent those actions, with the intent that the victim's death ... would result." *Tharp v. Commonwealth*, 40 S.W.3d 356, 361 (Ky.2000). Thus, despite the clear applicability of subsection (2) of the statute to homicides, accomplice liability for intentional murder can be imposed under both KRS 502.020(1) and (2).

At trial, the Commonwealth's proof included Appellant's numerous statements to police, an in-court identification of Appellant as the man Martin's neighbor had seen at Martin's home the night of the murder, and a series of text messages between Appellant and Parke immediately before the murder.

Although Appellant's counsel characterizes the Commonwealth's evidence as being devoid of *any* proof Appellant and Parke conspired to kill Martin, this is clearly incorrect. As noted previously, Appellant's written statement placed him at the scene of the crime and he admitted sending Parke a series of text messages at this time indicating the decision to kill Martin was up to Parke.

The text messages sent by Appellant, which were introduced by the Commonwealth, do not indicate an ambivalence to Martin's murder. In fact, the messages indicate the exact opposite. The text exchange occurred over the course of six minutes between midnight and 1:00 a.m. The exchange occurred as follows:

Appellant (to Parke): Wana do tha Big Deal? ? ? ? ? ? ? ? ? Now

Parke (to Appellant): Kill max

Appellant (to Parke): Yea get it watch c s i lately

Appellant (to Parke): Do it now

Appellant (to Parke): Do it now

The language of KRS 502.020(1) is "broad enough to embrace acts, words, agreements, encouragement, incitement, and every form of participation in concerted criminal activity." George G. Seelig, *Kentucky Criminal Law* § 3–3(b)(4) at 107 (2d. ed.2008). As such, this Court is satisfied that the Commonwealth's proof was sufficient to allow a jury to find Appellant guilty under KRS 502.020(1).

Under the Commonwealth's proof, the jury could readily find that Appellant actively participated in a scheme to murder Martin in one of the ways recognized by KRS 502.020(1),[1] and that it was the Appellant's intention to bring about the death of Martin. The text messages are a clear indication that the Appellant was involved in the plot to murder Martin. Appellant's texts to Parke to "Do it now" are not nearly as ambiguous as his counsel might characterize. In fact, in light of the other messages, it appears that Appellant was soliciting Parke to go through with the killing.

Similarly, this Court is satisfied that a jury could find guilt under KRS 502.020(2).[2] Accomplice liability under subsection (2) is meant to apply to "situations where an act which a defendant intentionally procures, assists or encourages causes an undesired yet probable consequence." KRS 502.020 Kentucky Crime Commission/LRC Commentary (1974). Thus, if Appellant intended that Martin be murdered, it and his conduct in conspiring with Parke were sufficient to allow conviction under KRS 502.020(2).

---

1. KRS 502.020(1) states:
(1) A person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he:
(a) Solicits, commands, or engages in a conspiracy with such other person to commit the offense; or
(b) Aids, counsels, or attempts to aid such person in planning or committing the offense; or
(c) Having a legal duty to prevent the commission of the offense, fails to make a proper effort to do so.

2. KRS 502.020(2) states:
(2) When causing a particular result is an element of an offense, a person who acts with the kind of culpability with respect to the result that is sufficient for the commission of the offense is guilty of that offense when he:
(a) Solicits or engages in a conspiracy with another person to engage in the conduct causing such result; or
(b) Aids, counsels, or attempts to aid another person in planning, or engaging in the conduct causing such result; or
(c) Having a legal duty to prevent the conduct causing the result, fails to make a proper effort to do so.

The Commonwealth produced more than a "mere scintilla" of evidence, *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991), and assuming the evidence presented by the Commonwealth is true, as this Court must, it would not be clearly unreasonable for a jury to find the Appellant guilty of murder. As such, the trial court did not err in denying his motion for a directed verdict.

### B. Directed Verdict for Robbery

■ Appellant's second argument on appeal is that he was entitled to a directed verdict of acquittal on the robbery-by-complicity charge. Appellant's argument stems from Criminal Rule 9.60, which states that a defendant's confession alone, unless made in open court, cannot be the only proof that an offense occurred. Specifically, Appellant contends that there was no proof of the robbery, or the *corpus delicti,* in the absence of his statement to police. This argument is not preserved for appeal, and thus this Court may only review the argument for palpable error under Criminal Rule 10.26.

Appellant's counsel characterizes the record as being completely devoid of any additional proof that corroborates Appellant's statement to detectives. This representation of the record, however, is wholly disingenuous. In addition to Appellant's written statement to police admitting his involvement with the robbery, the Commonwealth also introduced a recorded phone conversation between Appellant and Parke, the relevant section of which was as follows:

> Appellant: Yea, yea, I know it. This sounds bad but I just don't want to fucking get in no trouble over all this. You know what I'm saying?
>
> Parke: You're not going to unless they try to charge you with that cash. That will be the only thing. I'll take

the rap for it. You know I'm not going to do you that way.

> Appellant: Yeah man.

Admittedly it is not clear from the record which came first: Appellant's professed involvement in the robbery or Parke's mention of it. But this distinction is immaterial; either police already knew about the robbery from Appellant's written statement and it was corroborated by Parke's statement or Parke made his statement about "the cash" and police inquired further and Appellant admitted to the crime in his written statement. Either way, Appellant's confession was not the only proof of the robbery presented at trial.

■■ And while it is true that Criminal Rule 9.60 states that a defendant's conviction cannot be based solely on his own uncorroborated out-of-court statements, the corroboration requirement of Criminal Rule 9.60 "relates only to proof that a crime was committed, not to whether the defendant committed it." *Lofthouse v. Commonwealth,* 13 S.W.3d 236, 241 (Ky. 2000). "Once the corpus delicti has been established, the fact that the defendant committed the crime can be proven entirely by his own confession." *Id.* (citing *Dolan v. Commonwealth,* 468 S.W.2d 277 (Ky.1971)). The corroborative evidence aside from the confession need not prove the *corpus delicti* beyond a reasonable doubt. *Id.* Indeed, "proof of the corpus delicti may be established by considering the confession as well as the corroborating evidence." *Id.* (citing *Blades v. Commonwealth,* 957 S.W.2d 246, 250 (Ky.1997)).

In the present case, Appellant admitted his involvement in a robbery and this commission of the crime was corroborated by other evidence that the crime occurred, namely, the recorded telephone call. As such, it would not be clearly unreasonable for a jury to find him guilty, and the trial

court did not err, much less commit palpable error, in denying his motion for a directed verdict of acquittal.

### C. Jury Instructions

 In his third complaint of error, Appellant argues each of the complicity instructions was incorrectly given to the jury. Appellant acknowledges that his arguments are not preserved for appeal, but we review his argument for palpable error under Criminal Rule 10.26.[3] *See Martin v. Commonwealth*, 409 S.W.3d 340, 346–47 (Ky.2013) (applying palpable error review to jury instructions where the jury instruction was not correctly given).

 Under Criminal Rule 10.26, an unpreserved error may only be corrected on appeal if the error is both "palpable" and "affects the substantial rights of a party" to such a degree that it can be determined "manifest injustice resulted from the error." For error to be palpable, "it must be easily perceptible, plain, obvious and readily noticeable." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). The rule's requirement of manifest injustice requires "showing ... [a] probability of a different result or error so fundamental as to threaten a defendant's entitlement to due process of law." *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky.2006). Or, as stated differently, a palpable error is where "the defect in the proceeding was shocking or jurisprudentially intolerable." *Id.* at 4. Ultimately, "[m]anifest injustice is found if the error seriously affected the fairness, integrity, or public reputation of the proceeding." *Kingrey v. Commonwealth*, 396 S.W.3d 824, 831 (Ky.2013)

(quoting *McGuire v. Commonwealth*, 368 S.W.3d 100, 112 (Ky.2012)).

Appellant's specific argument is that each of the jury instructions for complicity was flawed because they did not require the jury to find Appellant acted with a specific mental state. The instruction for complicity to murder was as follows:

That in this county on or about August 25, 2010, and before the finding of the Indictment herein:

(1) Jesse Parke killed Thomas Max Martin by shooting him multiple times;

(2) That in so doing Jesse Parke caused the death of Thomas Max Martin intentionally; AND

(3) That prior to the shooting death of Thomas Max Martin by Jesse Parke, the [Appellant] either solicited, commanded, or conspired with Jesse Parke to engage in the conduct which resulted in the death of Thomas Max Martin, or aided, counseled or attempted to aid Jesse Parke in planning or committing the conduct performed by him which caused the death of Thomas Max Martin.

The second-degree arson instruction provided:

That in this county on or about August 25, 2010, and before the finding of the Indictment herein:

(1) Jesse Parke destroyed a building owned by Jerry Howard by fire;

(2) That Jesse Parke started the fire intentionally;

(3) That in so doing, it was Jesse Parke's intention to destroy the building; and

(4) That prior to the destruction by fire of a building owned by Jerry How-

---

**3.** Criminal Rule 10.26 states:
A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though in-

sufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.

ard by Jesse Parke, the [Appellant] either solicited, commanded, or conspired with Jesse Parke to engage in the conduct which resulted in the destruction by fire of a building owned by Jerry Howard, or aided, counseled or attempted to aid Jesse Parke in planning or committing the conduct performed by him which caused the destruction by fire of a building owned by Jerry Howard.

The first-degree robbery instruction provided:

> That in this county on or about August 25, 2010, and before the finding of the Indictment herein:
>
> (1) Jesse Parke stole Xanax pills, $280.00 cash and a small caliber pistol from Thomas Max Martin;
>
> (2) That in the course of doing so and with the intent to accomplish the theft, Jesse Parke used or threatened the immediate use of physical force upon Thomas Max Martin;
>
> (3) That when Jesse Parke did so, he was armed with a firearm;
>
> (4) That the firearm was a deadly weapon as defined under Instruction No. 2; and
>
> (5) That prior to the robbery of Thomas Max Martin by Jesse Parke, the [Appellant] either solicited, commanded, or conspired with Jesse Parke to engage in the conduct which resulted in the robbery of Thomas Max Martin, or aided, counseled or attempted to aid Jesse Parke in planning or committing the conduct performed by him which caused the robbery of Thomas Max Martin.

The Commonwealth acknowledges that the instructions are flawed, but argues that the error was not palpable, but was instead harmless because the evidence as a whole left no doubt of Appellant's guilt. We cannot accept this argument and find that the use of the instructions constituted palpable error.[4]

"[C]riminal convictions must rest upon a jury determination that the defendant is guilty of each and every element of the crime with which he is charged." *Miller v. Commonwealth,* 391 S.W.3d 857, 868 (Ky.2013) (citing *Thacker v. Commonwealth,* 194 S.W.3d 287, 290 (Ky.2006)). Despite this general rule, however, this Court has held that "[a]n erroneous instruction that omits an element of the offense ... is subject to harmless-error analysis," *id.,* though the Commonwealth bears the burden of this assertion, *Stewart v. Commonwealth,* 306 S.W.3d 502, 508 (Ky.2010) (citing *Harp v. Commonwealth,* 266 S.W.3d 813, 818 (Ky.2008)).

The Commonwealth has not persuaded the Court that where, as in this case, the missing element is the defendant's mental state, the error should be harmless. It has not cited any authority from this or any other jurisdiction providing that a jury instruction that omits the offense's mental state is harmless error. Indeed, our precedent demonstrates the opposite.

We have affirmed complicit convictions where the instructions include the mental state in a flawed way but nonetheless incorporate it. For example, in *Smith v. Commonwealth,* 370 S.W.3d 871 (Ky.2012), the Court considered a complicity instruction for second-degree assault that, on its face, omitted the intent element. The Court nevertheless held that the instructions were adequate because the requisite

---

4. The jury was also given the option of convicting Appellant of the lesser-included homicide offenses of manslaughter and reckless homicide. While he was not convicted of those offenses due to his complicity to murder conviction, Appellant is correct that those instructions were flawed for the identical reasons set forth herein; however, Appellant is incorrect that first-degree manslaughter is not a result crime.

mental state was incorporated by reference into the main instruction by the separate definition of "complicity." *Id.* at 879. Indeed, this Court has held that as long as the jury is aware of and required to find the requisite mental state for accomplice liability in some way, an instruction though imperfect, will be adequate. *See Crawley v. Commonwealth,* 107 S.W.3d 197, 200 (Ky.2003).

But where the jury is not instructed at all on the mental state, we have reversed even when the error was not preserved. In *Harper v. Commonwealth,* 43 S.W.3d 261 (Ky.2001), we reversed a complicity-to-murder conviction on an apparent palpable error theory for lack of a defined mental state. We held that "[t]he language of KRS 502.020(1) and the accompanying commentary make clear that intent is an essential element to a conviction under subsection (1) of the statute." *Id.* at 263–64. We found it was "reversible error" where "the trial court failed to instruct the jury on the *essential element* of whether Harper, through her actions, had the intention that Phillips either be murdered or robbed," *Id.* at 264 (emphasis added). And we apparently considered the error to be palpable, though we did not say so expressly, because we reversed despite the instructions being "word-for-word identical to the complicity instructions tendered by [the defendant]." *Id.* at 268 (Cooper, J., concurring).

This Court, as evidenced by this precedent, cannot affirm in the face of an instructional error where the jury has not found that the appellant acted with a required mental state. Unlike other elements which, when omitted, may result in harmless error under the specific circumstances of that case "[i]ntent is an essential element and failure to instruct is prejudicial error." *Carpenter v. Commonwealth,* 771 S.W.2d 822, 825 (Ky.1989) (citing *Wat-*

*kins v. Commonwealth,* 298 S.W.2d 306 (Ky.1957)). We thus hold that the error was not merely harmless.

Of course, the question here is whether the error was palpable. The Court has never expressly stated in a published opinion that the omission of the mental-state element from a complicity instruction rises to the level of palpable error. Recently, however, the Court decided *Crews v. Commonwealth,* No. 2012–SC–000596, 2013 WL 6730041 (December 19, 2013), which was an unpublished case. There we suggested that such error does amount to palpable error, stating: "For the jury to have incorporated the definition of complicity by inference in the present case, the jury would have had to possess some personal knowledge of the elements of complicity, since nothing in the instructions remotely resembles KRS 502.020." *Id.* at *9. We further held that "[t]he instructions . . . erroneously failed to require that [the defendant] *affirmatively acted with the intention of promoting or facilitating* the commission of the offense," *id.,* and "[a]s worded, the instruction d[id] not even state elements of a crime upon which a jury could have convicted [the defendant]," *id.*

Similarly, in the present case, the jury instructions for complicity to murder, second-degree arson, and first-degree robbery did not require the jury to find that all of the elements were necessary for Appellant's guilt. Such errors are not only not harmless, but are indeed palpable, and require reversal.

Appellant also argues in his brief that the jury instructions for complicity to first-degree robbery and complicity to second-degree arson were both erroneous because they were phrased as if they were "result crimes" rather than "conduct crimes," as they are defined in their respective statutes. Although we reverse Appellant's convictions on the grounds that the in-

structions were erroneous on different grounds, the Court believes this issue may resurface on remand, and thus will briefly address Appellant's claim. Appellant is correct that robbery and arson are act crimes, not result crimes. (While the arson statutes have been read to require damage to property—a result—they do so only to the extent that some damage is required to show the illegal act, that is, setting fire to the structure, father than setting fire to personalty in or near the structure.) We need not pass on whether the instructions as given were erroneous. It suffices to point out that on retrial, the complicity instructions should be drafted under KRS 502.020(1).

### III. Conclusion

For the foregoing reasons, the judgment of the Monroe Circuit Court is reversed and remanded for further proceedings consistent with this Opinion.

All sitting. All concur.